**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED: 6/10/2020**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RICHARD J. CAPAK,

     Plaintiff,

   v.

TAUHEED EPPS *also known as* 2 CHAINZ
AND RORY DORALL SMITH,

     Defendants.

---

18-CV-4325 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

   This action arises out of an altercation between Plaintiff Richard J. Capak, a celebrity photographer and videographer, and Defendant Rory Dorall Smith, a bodyguard who was working for Defendant Tauheed Epps in connection with his appearance at The Tonight Show Starring Jimmy Fallon in New York City on October 27, 2017.[1]  Epps is a "well-known hip hop/rap recording artist" and musician, professionally known as "2 Chainz," who has won "several awards for his artistic work."  *See* Epps 56.1 ¶¶ 1-2.  Smith has served as a bodyguard for Epps on many occasions over the past decade, *see id.* ¶ 4, and was acting in that capacity when he allegedly attacked and injured Plaintiff as he attempted to videotape Epps arriving for his Tonight Show appearance (the "Alleged Incident"), *see id.* ¶ 13.  In particular, Plaintiff contends that, as he tried

---

[1] These facts are undisputed unless otherwise noted, and are drawn primarily from the parties' submissions in connection with the pending motion, including Epps' Rule 56.1 Statement, *see* Dkt. 73 ("Epps 56.1"); Plaintiff's response to Epps' Rule 56.1 Statement, *see* Dkt. 86 ("Pl. 56.1"); the declarations and exhibits filed in support of Epps' motion, *see* Dkt. 69 ("Raymond Decl." and/or "Raymond Ex."), Dkt. 70 ("Epps Decl."), and Dkt. 71 ("Smith Decl."); the declaration of Chad Russell filed in support of Plaintiff's opposition, *see* Dkt. 85 ("Russell Decl."); and the exhibits attached to Plaintiff's opposition, *see* Dkts. 84-1 to 84-5 ("Pl. Ex.").  Where only one party's Rule 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute the fact, or merely objects to inferences drawn from the fact.  Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied only with a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c)-(d).

to videotape Epps entering and walking near NBC studios at 30 Rockefeller Plaza, Smith "attacked, assaulted and battered" him, and that he sustained personal injuries as a result. *See* Notice of Removal Ex. A, Dkt. 3-2 ("Compl.") ¶¶ 7-9, 13; *see also* Epps 56.1 ¶ 22.

On December 4, 2017, Plaintiff filed this action against Defendants Epps and Smith in the Supreme Court of the State of New York, asserting claims for assault, battery, negligence, and negligent hiring and retention. Defendants subsequently removed the action to this Court. Smith denies the allegations against him, and has invoked his Fifth Amendment right against self-incrimination and asserted various affirmative defenses in this action.[2] Now before the Court is Epps' motion for summary judgment, which is premised on the contention that Epps was not Smith's employer on the date of the Alleged Incident and thus cannot be held liable for his actions. Because the Court agrees, and concludes that Smith was an independent contractor and not Epps' employee on October 27, 2017, Epps' motion is granted.

## BACKGROUND

### I.    Relationship Between Epps, Smith, and Street Execs

Over the past ten to eleven years, "including for approximately eight years prior to October 27, 2017," Smith worked for Epps as a bodyguard, providing protective and security services for specific events. *See* Epps 56.1 ¶ 4. According to Smith's deposition testimony, he first received a job as a bodyguard for Epps, who is his cousin, approximately eleven years ago, after he "asked [him] for a job." *See* Pl. Ex. 2 ("Smith Tr.") at 19. Epps testified that he "personally" did not hire Smith, but rather, that his "management team," "Street Execs Management" ("Street Execs"), first

---

[2] As detailed in this Court's prior memorandum opinion denying Smith's motion to stay discovery pending resolution of his criminal proceedings, *see* Dkt. 23, a criminal complaint was filed against Smith following the incident. Smith voluntarily surrendered to the police and was charged with two counts of assault in the third degree, one count of attempted assault in the third degree, and one count of harassment in the second degree. *See id.* at 2. The Manhattan District Attorney's Office subsequently added a charge of aggravated harassment, and Smith then entered into a re-pleader agreement with the District Attorney. *See id.* at 3.

hired him about "a decade ago" to provide protective services.  *See* Pl. Ex. 3 ("Epps Tr.") at 23-24; *see also id.* at 26.  According to Epps, Street Execs hires certain individuals to work for him, such as dancers, DJs, and security guards, *see id.* at 14-15, and each time Smith was hired to provide protective services, including on the date of the Alleged Incident, he was "hired by Street Execs," *see id.* at 29.  Epps also testified that Street Execs has "direct authority" to "hire and fire people," as well as to "pay people," on his behalf, *see id.* at 44, and that he is not personally involved in "the hiring process" when Street Execs decides to hire someone to provide protective services, *see id.* at 26-27.  Smith testified that, between when he was first hired and the date of the Alleged Incident, he worked for Epps "[c]onsistently," for a total of 50 to 100 times, if not more.  *See* Smith Tr. at 22-23.  Smith also accompanied Epps on tour seven times.  *See id.* at 25.

The parties dispute the capacity in which Smith worked for Epps.  Epps asserts that Street Execs had "occasionally retained" Smith over the past decade, and that when it had done so, it had retained Smith as an "independent contractor" to provide Epps with "security services for specific occasions."  Epps 56.1 ¶ 4; *see also* Epps Decl. ¶ 3.  Epps also contends that neither he nor Street Execs ever "employed" Smith, such that Smith was not Epps' "employee" on October 27, 2017.  *See* Epps 56.1 ¶ 5.  Smith similarly asserts that he had been retained by Epps' "business management agency" to "provide security services" for Epps "as an independent contractor," and that he was "not an employee of" Epps or of Street Execs.  *See* Smith Decl. ¶ 3.  Plaintiff, however, maintains that whether Smith was an "independent contractor" is "disputed" and "is at the very heart of this motion."  *See* Pl. 56.1 ¶ 4.  According to Plaintiff, there are "issues" as to (1) "who the actual hiring party is, [] Epps or Street Execs," (2) "how much control [] Epps had over [] Smith's actions while he was acting as a bodyguard," and (3) "how [] Smith was paid."  *See id.*

3

It is undisputed that Smith did not work for Epps on a "daily" basis.  *See* Pl. 56.1 ¶ 6. Rather, Smith "consider[ed] each request to work for [] Epps on a job-by-job basis" and was able "to turn down [an] offer for any reason."  *See* Epps 56.1 ¶¶ 7-8.  In terms of his payment, Smith testified that he was typically paid through direct deposit, which he would discuss with "the colleagues" who work for Epps.  *See* Smith Tr. at 99-100.  He also testified that Epps had "nothing to do with" the payment.  *See id.*  Epps testified he had "never paid anyone directly," and that Smith would get paid based on the "job he did" and the "rate [that] was negotiated."  *See* Epps Tr. at 34-35.  Epps assumed that Street Execs paid Smith, but did not seem to know the details of how much or how often Smith was paid.  *See id.* at 35.  Epps also testified that, as far as he knew, Smith was not paid daily.  *See id.*  In connection with the work that he did for Epps, Smith "receive[d] a Form 1099 to report his income, not a Form W-2."[3]  *See* Epps 56.1 ¶ 9.  Smith did not receive any health insurance from Epps or from Street Execs.  *See id.* ¶ 10.  Nor did he "receive[] any type of bodyguard training" from either party.  *See id.* ¶ 12; *see also* Smith Tr. at 23-24 (testifying that he never received "any type of bodyguard training" from Epps or anyone who worked for Epps).

Epps maintains that Smith did not "work a set schedule" for him, and that he was able to "take jobs for anyone else if he [chose] to do so."  *See* Epps 56.1 ¶ 6.  Plaintiff, however, takes issue with this statement, asserting that Smith could not "set his own time schedule while he [was] acting as [] Epps' bodyguard."  *See* Pl. 56.1 ¶ 6.  Smith testified that Epps did not give him a "specific time to begin working for him," or a "specific time that [his] shift would [] end[]," but that he could not have "left [the job] on [his] own" before it was finished.  *See* Smith Tr. at 98.  He explained that he would not necessarily have to wait until Epps explicitly told him he was finished

---

[3] Plaintiff maintains that "Defendant's tax filing status is irrelevant in this matter," but does not dispute that Smith received a Form 1099, and not a Form W-2.  *See* Pl. 56.1 ¶ 9.

working before he could leave for the day; rather, he would know when his day was over. *See id.* at 98-99; *see also id.* at 99 ("It really doesn't end like that.  It's like I never stop until the day is over. When he leaves this room, that's when my day dies."). Epps testified that, on October 27, 2017, Smith was supposed to work as his bodyguard "until the job [was] done," which likely would have been when Epps "was done performing the Jimmy Fallon Show." *See* Epps Tr. at 78.  When asked whether Smith could have "left at any time after he arrived at NBC without [Epps'] permission," Epps responded that he did not know whether Smith could have done so, and testified that if Smith had left without his permission, Epps "wouldn't have [done] anything." *See* Epps Tr. at 76-77.

The parties also contest what, if any, instructions or directions Smith received about his duties as a bodyguard for Epps.  Smith testified that his responsibilities as a bodyguard for Epps were generally "to make sure the perimeter is clear and [] Epps is safe," *see* Smith Tr. at 23, but that he never received "any type of instruction or direction about what [his] duties and . . . responsibilities were as a bodyguard for [] Epps from someone who worked for [] Epps, or [] Epps himself," *id.* at 24.  On October 27, 2017, he explained, his duties were "to keep [Epps] safe and make sure he makes it to the taping on time and safely, that's about it." *See id.* at 44.  He testified further that among his responsibilities that day were "making sure [Epps] got back to the hotel safely" and that "nothing happen[ed] to him," as well as "taking care of the perimeter" to make sure it was clear, which included "protecting [Epps] from other people that might be a threat" and from "obstacles in his way because he was injured" at the time.  *See id.*  Smith also testified that he never had a conversation with Epps about what was expected of him as a bodyguard.  *See id.* at 26.  Epps similarly asserts that Smith "never received any type of instruction or direction about what his duties and responsibilities were as a bodyguard for [him], either from [] Epps or from

Street Execs." *See* Epps 56.1 ¶ 11.  Epps further asserts that Smith was "not given any instruction" by Epps or Street Execs on what specifically he "was supposed to do to keep [] Epps safe" on October 27, 2017.  *See id.* ¶ 14.  Epps maintains that neither he nor Street Execs ever "instruct[ed] or authorize[d] [] Smith to use physical force against anyone, including Plaintiff, while providing security services for [] Epps."  *Id.* ¶ 15.  Plaintiff, on the other hand, asserts that whether Smith received any instruction from Epps or Street Execs, including "[w]hether [] Epps or Street Execs instructed or authorized [] Smith to use physical force against anyone," "is in dispute in this matter."  *See* Pl. 56.1 ¶¶ 11, 14-15, 19-20.

## II.   October 27, 2017 Incident

As noted above, Smith was working as a bodyguard for Epps on October 27, 2017, "in connection with [] Epps' appearance on The Tonight Show Starring Jimmy Fallon, at 30 Rockefeller Plaza in New York City."  *See* Epps 56.1 ¶ 13.  According to Epps' deposition testimony, Street Execs—not Epps—hired Smith to work that day.  *See* Epps Tr. at 47.  When Plaintiff attempted to videotape Epps as he was arriving for the show, *see* Compl. ¶¶ 7-9, Smith allegedly "struck" Plaintiff, causing him to "allegedly suffer[] injuries," *see* Epps 56.1 ¶ 22.  It is uncontested that Epps "was not aware of the Alleged Incident as it took place," *id.* ¶ 23, and "did not see or hear any part of the Alleged Incident or its aftermath," *id.* ¶ 24.  Moreover, it is undisputed that video surveillance demonstrates that Epps was seen "turning the corner of the 30 Rockefeller Plaza lobby and walking away" from Smith and Plaintiff "before the Alleged Incident occur[red]."  *Id.* ¶ 25.  Epps maintains that he "did not and could not have foreseen any injury" to Plaintiff, *id.* ¶ 21, and that he was in fact "not involved in any manner with the [Alleged Incident],"

*id.* ¶ 22.  Plaintiff, however, asserts that Epps "was involved in" the Alleged Incident as "Smith's employer."  *See* Pl. 56.1 ¶ 22.[4]

Nonetheless, it is undisputed that Smith had "an exemplary record of avoiding physical altercations when providing security services and de-escalating stressful situations," Epps 56.1 ¶ 17, and that prior to October 27, 2017, Smith "had never used physical force on someone while providing security services to anyone, including [] Epps," *id.* ¶ 16.  It is further uncontested that as of October 27, 2017, Epps "was not aware of any prior violent acts" by Smith, or of Smith "having any propensity for violence."  *Id.* ¶ 18.  Epps asserts that neither he nor anyone at Street Execs ever directed Smith "to engage in a physical confrontation or a manner that would precipitate violence," *id.* ¶ 20, and that on October 27, 2017 in particular, he did not "direct, instruct, or encourage" Smith to "take any actions against Plaintiff, let alone use physical force on Plaintiff," *id.* ¶ 19.

## PROCEDURAL HISTORY

Plaintiff initially filed this action in the Supreme Court of the State of New York on December 4, 2017, asserting state law claims for assault, battery, and negligence against both Defendants, as well as negligent hiring and retention against Epps.  *See* Dkt. 3-2.  On May 16, 2018, Defendants removed the action to this Court based on diversity jurisdiction.  *See* Dkt. 3. Fact discovery closed on December 5, 2019.  *See* Dkts. 32-1, 33.  At a conference before Magistrate Judge Parker on December 18, 2019, Epps indicated that he intended to file a motion for summary judgment, and Plaintiff expressed a desire to amend the complaint to add Street Execs as a defendant.  *See* Dkt. 41.  Judge Parker set a briefing schedule on the latter motion.  *See id.*  Plaintiff

---

[4] Although he does not cite any evidence to support his contention, Plaintiff also asserts that Epps "could have and should have easily foreseen that [he] could have been injured by [] Smith – particularly since [] Epps and Street Exec Management are claiming that they never gave [] Smith any kind of instruction of any sort about how to conduct himself as a bodyguard."  *See* Pl. 56.1 ¶ 21.

filed his motion to amend the complaint on January 10, 2020, *see* Dkts. 51, 61, and Epps filed an opposition on January 24, 2020, *see* Dkt. 66.  On April 7, 2020, Judge Parker issued a Report and Recommendation (the "Report"), recommending that the Court deny Plaintiff's motion, *see* Dkt. 92, which the Court adopted in full on May 19, 2020, *see* Dkt. 94.

Epps filed the instant motion for summary judgment on January 13, 2020.  *See* Dkt. 53.[5] Plaintiff filed his opposition on February 7, 2020, *see* Dkt. 79, and Epps filed his reply on February 28, 2020, *see* Dkt. 88.[6]

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citations omitted).  To survive summary judgment, "a plaintiff must provide more than conclusory allegations . . . and show more than some metaphysical doubt as to the material facts." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106, 101 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Tafari v. Annetts*, 363 F. App'x 80, 82 (2d Cir. 2010) ("[C]onclusory statements or mere allegations are not sufficient to defeat a summary judgment motion.") (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)).  In deciding such a motion, however, the Court must "construe the facts in the light most favorable to the non-moving

---

[5] After the Court denied Epps' request to file his memorandum of law and other supporting papers under seal and/or in redacted form, *see* Dkt. 58, Epps refiled his supporting materials on January 27, 2020.  *See* Dkts. 69-73.

[6] Plaintiff initially filed the majority of his opposition brief and supporting papers in redacted form.  After the Court instructed Plaintiff to refile those papers in unredacted form, or to seek to file portions under seal pursuant to the Court's Individual Rules and the Southern District's Local Rules, *see* Dkt. 81, Plaintiff refiled unredacted versions of his papers on February 17, 2020.  *See* Dkts. 84-86.

party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists.  *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Id*.  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial."  *CILP Assocs., L.P. v. Price Waterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation and alteration omitted).

## DISCUSSION

### I.       Plaintiff's Assault, Battery, and Negligence Claims

Plaintiff's First and Second Causes of Action against Epps—for assault and battery and for negligence, respectively—are premised on the theory that Epps was Smith's employer on the date of the Alleged Incident.  *See, e.g.*, Compl. ¶ 11 (alleging that Smith was "acting within the scope of his employment" with Epps when he "committed the . . . assault and battery upon" Plaintiff); *id.* ¶ 14 (alleging that Epps "authorized the actions of his agent, servant, employee and/or bodyguard" with respect to Smith's assault and battery on Plaintiff); *id.* ¶ 17 (alleging that Defendants were "negligent . . . with regard to the assault and battery" allegedly committed on Plaintiff by Smith, who was "acting agent, servant, employee, and/or bodyguard" of Epps).  Epps moves for summary judgment on Plaintiff's assault and battery and negligence claims on the basis that Smith worked for Epps as an independent contractor, and not an employee, and that Epps therefore cannot be held liable for any tort committed by Smith.  *See* Epps Mot. at 6-11.  Epps

9

further contends that even if Smith is deemed to be an "employee" of Epps, the tortious acts underlying the Alleged Incident were outside the scope of Smith's employment, and thus Epps still cannot be held liable.  *See* Epps Mot. at 11-13.  In his opposition, Plaintiff primarily argues that summary judgment should be denied because there are genuine issues of material fact in dispute "regarding the relationship between" Epps and Smith.  *See* Pl. Opp'n at 4.

### A.  Independent Contractor or Employee

Under New York state law, an employer may be held vicariously liable for torts committed by its employees acting within the scope of their employment.[7]  *See Rivera v. State*, 34 N.Y.3d 383, 389 (2019).  This doctrine applies both to intentional torts and the negligence of an employee. *See id.*; *see also Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999) ("Pursuant to [the doctrine of respondeat superior], the employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment.").  It is well established, however, that an employer is not liable for the negligent or tortious acts of an individual it hires as an independent contractor.  *See, e.g.*, *Phillips v. Uber Techs., Inc.*, No. 16 Civ. 295 (DAB), 2017 WL 2782036, at *4 (S.D.N.Y. June 14, 2017) (explaining that "[g]enerally, an employer who hires an independent contractor, as distinguished from an employee, is not liable for that individual's negligent or tortious acts"); *Von-Ary v. Cain, LLC*, No. 05 Civ. 991 (LAP), 2009 WL 1835934, at *3 (S.D.N.Y. June 26, 2009) (same); *Cohen v. Deepdale Gardens Corp.*, 115 N.Y.S.3d 613, at *2 (Sup. Ct. 2019) (same).

---

[7] New York state law applies to this diversity action because the alleged tortious acts occurred in New York, *see Velez v. Sebco Laundry Sys., Inc.*, 178 F. Supp. 2d 336, 339 (S.D.N.Y. 2001), and because the parties do not dispute its applicability, *see Allison v. Rite Aid Corp.*, 812 F. Supp. 2d 565, 568 (S.D.N.Y. 2011) ("Because the parties have relied on New York State law in presenting their arguments to this Court, we assume that New York law applies to this diversity action.").

An "employee" is "someone who works for another subject to substantial control, not only over the results produced but also over the means used to produce the results," while "[a] person who works for another subject to less extensive control is an independent contractor." *O'Brien v. Spitzer*, 7 N.Y.3d 239, 242 (2006); *see also Arcure v. Annie Liebovitz Studios, Inc.*, No. 98 Civ. 9127 (JFK), 2001 WL 262736, at *5 (S.D.N.Y. Mar. 15, 2001) ("[A]n independent contractor is 'one who, in exercising an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer, except as to the product or result of his work.'") (quoting *Cubby, Inc. v. Compuserve, Inc.*, 776 F. Supp. 135, 142-43 (S.D.N.Y. 1991)).  Courts have repeatedly noted that "[c]ontrol of the method and means by which the work is to be done" is "the critical factor" in determining "whether one is an independent contractor or an employee for purposes of tort liability." *See, e.g.*, *Phillips*, 2017 WL 2782036, at *4 (quoting *Sanabria v. Aguero-Borges*, 986 N.Y.S.2d 553, 554 (App. Div. 2014)); *Sachs v. Cantwell*, No. 10 Civ. 1663 (JPO), 2012 WL 3822220, at *18 (S.D.N.Y. Sept. 4, 2012); *Dean v. City of Buffalo*, 579 F. Supp. 2d 391, 398 (W.D.N.Y. 2008).

An employer may therefore be "held liable for the conduct of an independent contractor, if due to the 'degree of control exercised by the purported employer,' the contractor is deemed to be the party's employee as a matter of law." *See J.L. v. E. Suffolk Boces*, No. 14-CV-4565 (SIL), 2018 WL 1882847, at *4 (E.D.N.Y. Apr. 19, 2018) (quoting *McCann v. Varrick Grp. LLC*, 923 N.Y.S.2d 471, 472 (App. Div. 2011)); *see also Von-Ary*, 2009 WL 1835934, at *3 ("An employer may be held liable for its independent contractor's torts when the employer assumes control or dictates particulars of the independent contractor's work.").  Nonetheless, "the mere retention of general supervisory powers over the acts of the independent contractor will not impose liability," *Von-Ary*, 2009 WL 1835934, at *3 (quoting *Wright v. Esplanade Gardens*, 540 N.Y.S.2d 805, 806

11

(App. Div. 1989)), and only "an employer who exercises *more than mere supervisory powers* over the independent contractor may be vicariously liable for the torts of that contractor," *see Tesillo v. Emergency Physician Assocs., Inc.*, 376 F. Supp. 2d 327, 331 (W.D.N.Y. 2005) (emphasis added).[8] "Although the question of independent contractor status is often a question of fact, where the evidence in the record is undisputed, courts may resolve the issue as a matter of law." *Murphy v. Guilford Mills, Inc.*, No. 02 Civ. 10105 (LTS) (THK), 2005 WL 957333, at *5 (S.D.N.Y. Apr. 22, 2005).

The evidence before the Court establishes that Smith was not an "employee" of Epps. To determine whether an individual is "an employee (whose acts can be the basis for vicarious liability) or an independent contractor (whose acts cannot), the critical factor is the degree of the employer's '[c]ontrol of the method and means by which the work is to be done.'" *See Sachs*, 2012 WL 3822220, at *18 (quoting *Gitchell v. Corby*, 881 N.Y.S.2d 783, 785 (App. Div. 2009)); *see also Von-Ary*, 2009 WL 1835934, at *3 ("Whether a party is an independent contractor or employee for the purposes of tort law depends on the employer's level of control over the manner and method in which the work is performed."). "Factors relevant to assessing control include whether a worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule." *Phillips*, 2017 WL 2782036, at *4 (quoting *Sanabria*, 986 N.Y.S.2d at 555); *see also Nachman v. Koureichi*, 85 N.Y.S.3d 185, 187 (App. Div. 2018). While control over the manner of performance is the most important factor in the analysis, *see Sachs*, 2012 WL 3822220, at *18, other factors may also be relevant, such as "the extent of control exercised over the work of the employee,"

---

[8] Under New York law, an employer can also be held liable for injuries caused by an independent contractor if the employer was negligent in hiring the contractor. *See Arcure*, 2001 WL 262736, at *4. But as discussed below, Plaintiff appears to have abandoned his negligent hiring claim against Epps and, in any event, has not set forth evidence to establish any genuine issues of fact as to that cause of action.

"whether the employee is engaged in a distinct occupation or business," "whether the work usually is supervised by an employer in that particular locality," "what level of skill is required in the occupation," "whether the employer or the employee supplies the instrumentalities," "the length of employment," "whether payment is per job or time-based," "whether the work is part of the employer's regular business," "the intent/belief of the parties," and "whether the worker received benefits." *See Tesillo*, 376 F. Supp. 2d at 332 (citing *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1033-34 (2d Cir. 1997)).

The critical inquiry in determining whether Smith was an independent contractor or an employee of Epps turns on the degree of control that Epps exercised over the manner and methods in which Smith performed his work as a bodyguard. Although Epps may have had some control over the work Smith was hired to perform, there is nothing in the record to suggest that he had any control over the specific "methods" or "means" by which Smith was to accomplish that work. "There is . . . a key distinction between control over the results of an independent contractor's work, generally specified through the contract or agreement, and interference with the independent contractor's work through control over the 'method and means' of his performance." *Murphy*, 2005 WL 957333, at *5; *see also, e.g.*, *Dean*, 579 F. Supp. 2d at 400-01 ("New York caselaw draws a critical distinction between direction by the employer as to the work to be performed by an independent contractor, on the one hand, and control over the 'method and means' of the performance of that work, on the other."); *Beach v. Velzy*, 238 N.Y. 100, 104 (1924) ("That appellant gave some directions, not as to method or means of doing the work, but as to the work to be done, does not change the relation of the parties. He did little more than to furnish some verbal specifications for roofing, leaving to claimant control over the time, method, and means of doing the work."); *Melbourne v. N.Y. Life Ins. Co.*, 707 N.Y.S.2d 64, 67 (App. Div. 2000) ("Indeed,

there is no evidence that [defendant], other than requesting the examinations be done, had anything at all to do with the manner in which they were performed."). As such, the mere fact that Epps— or even those who worked for him—may have hired and/or generally supervised Smith, including by telling Smith what time to begin a particular job and when he was finished for the day, is insufficient to establish that Smith was Epps' employee. *See Murphy*, 2005 WL 957333, at *5 ("The retention of general supervisory powers to ensure that an independent contractor meets the plans and specifications of an agreement will not alone render a defendant vicariously liable for the contractor's negligent conduct."); *McCann v. Varrick Grp., LLC*, No. 109534/06, 2010 WL 1637080, at *6-7 (N.Y. Sup. Ct. Apr. 9, 2010), *aff'd*, 923 N.Y.S.2d 471 (App. Div. 2011) (holding that security guard was an independent contractor even assuming the restaurant "can and does give [the security guard] instructions about how to handle security at the restaurant when he is there, or he is assigned a particular task" because there was "no evidence that [the security guard] ha[d] ever been closely supervised by any of defendant's employees or that any of them control the details of his work").

Plaintiff has thus failed to raise a genuine issue of material fact as to whether Epps controlled the "method and means" by which Smith's work as a bodyguard was to be done, including on October 27, 2017. Many of the other factors that courts typically consider further weigh in favor of a finding that Smith was an independent contractor. Smith was able to work for Epps at his own convenience, was not on a fixed schedule, and was free to engage in other employment. Indeed, Smith did not work "daily" or "a set schedule" for Epps, was able to "take jobs for anyone else if [he chose] to do so," "consider[ed] each request to work for [] Epps on a job-by-job basis," and was able to "turn down any offer" to work for Epps "for any reason." *See* Smith Decl. ¶ 4; Epps Decl. ¶ 4; Pl. 56.1 ¶ 6. There is also no evidence that Smith received any

"fringe benefits" from Epps.  It is undisputed, for instance, that Smith "receive[d] no health insurance from [] Epps or from Street Execs."  *See* Epps 56.1 ¶ 10.  Nor is there evidence that Smith was on Epps' "payroll."  Smith received a Form 1099, not a Form W-2,[9] *see* Smith Decl. ¶ 5, and appears to have been paid per job, as opposed to on a daily or weekly basis.[10]  For his work on October 27, 2017, for example, Smith was paid $500 total for the entire job, regardless of how many hours he ended up working.  *See* Smith Tr. at 31 ("Q: [H]ow much [was] Mr. Epps [] paying you to be his bodyguard that day? A: That day 500. Q: Total for the whole day? A: The whole day. Q: How long was your day supposed to last as a bodyguard, the number of hours, or just an event, or something else? A: The entire day.").  Finally, the intent and belief of the parties militates towards a finding of independent contractor status.  Both Epps and Smith have declared, under penalty of perjury, that Smith was consistently retained as an independent contractor, and was not an employee of Epps or of Street Execs on October 27, 2017.  *See* Epps Decl. ¶ 3; Smith Decl. ¶ 3.  And while Plaintiff contends that there are "issues" as to "how much control [] Epps had over [] Smith's actions while he was acting as a bodyguard," *see* Pl. 56.1 ¶¶ 4-5, 9, 13 22, and as to whether Smith had "received any instruction from [] Epps or Street Execs," *see id.* ¶¶ 11, 14, a review of the record citations as to these purported "issues" makes plain that there are in fact no

---

[9] Despite Plaintiff's contention that Smith's "tax filing status is irrelevant," *see* Pl. 56.1 ¶ 9, Smith's receipt of a Form 1099, as opposed to a W-2, is indicative of his independent contractor status.  "Independent contractors typically utilize Form 1099, whereas employees utilize Form W-2." *Yu v. N.Y.C. Hous. Dev. Corp*, No. 07 Civ. 5541 (GBD) (MHD), 2011 WL 2326892, at *28 n.35 (S.D.N.Y. Mar. 16, 2011), *report and recommendation adopted,* 2011 WL 2183181 (S.D.N.Y. June 3, 2011), *aff'd,* 494 F. App'x 122 (2d Cir. 2012); *see also Leach v. Kaykov*, No. 07-CV-4060 (KAM) (VVP), 2011 WL 1240022, at *21 (E.D.N.Y. Mar. 30, 2011) ("When an individual is paid by the job or receives a 1099 tax form, he or she is more likely to be considered an independent contractor.").

[10] Citing pages 31 and 99-100 of Smith's deposition testimony, and pages 34-35 of Epps', Plaintiff asserts that "there are issues regarding how [] Smith was paid." *See* Pl. 56.1 ¶¶ 4-5, 9, 13, 22.  But this deposition testimony demonstrates only that Smith's payment was job-based, not hourly or weekly, and that Epps was not involved in that aspect of the relationship. *See, e.g.*, Smith Tr. at 31 (testifying that he was paid $500 for his work on October 27, 2017); *id.* at 99-100 (testifying that his payment was "just between [him] and the colleagues, . . . the people that work for [Epps], so [Epps] has nothing to do with that part"); Epps Tr. at 34-35 (testifying that he "imagine[d]" that his "management company" would pay Smith for "whatever job he did and [at] whatever rate was negotiated . . . depending on how much he worked or whatever he did").

material issues in dispute.[11]   A party opposing summary judgment must set forth sufficient evidence to permit a reasonable jury to return a verdict in its favor, identifying "specific facts showing that there is a genuine issue for trial."   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256 (1986).  Plaintiff has failed to identify specific facts showing that there is a genuine issue for trial, and it is insufficient for Plaintiff merely to state that such "issues" exist.

Indeed, although the question of whether an individual is an independent contractor or an employee is often one of fact, numerous New York courts have nonetheless concluded, as a matter of law, that a security guard like Smith is an independent contractor for purposes of tort liability. *See, e.g.*, *McLaughlan v. BR Guest, Inc.*, 52 N.Y.S.3d 92, 93 (App. Div. 2017) (affirming summary judgment for BR Guest based on findings that its security guard was an independent contractor when the alleged assault occurred, as the "evidence show[ed] that [the security guard] was not on BR Guest's payroll, did not receive health insurance or other fringe benefits, and that BR Guest contracted for his services as a security guard from [a third party]"); *Vargas v. Beer Garden, Inc.*, 791 N.Y.S.2d 521, 521-22 (App. Div. 2005) (affirming decision that the nightclub was not security guard's employer despite evidence that the nightclub "decided the number of guards needed on a

---

[11] For the first point, Plaintiff cites pages 35 and 98-99 of Smith's deposition testimony, "regarding transportation" and "regarding [] Smith's ability to begin and end his work day at his own discretion," respectively.  Plaintiff also cites pages 76-78 of Epps' deposition testimony to support his assertions that Smith was "not at NBC voluntarily" on the date of the Alleged Incident, and that Epps was not "aware what would happen if [] Smith left before the end of his work day."  None of that testimony raises a genuine dispute as to how much control Epps had over Smith. Plaintiff's reliance on testimony "regarding transportation," for instance, makes little sense as Smith merely explained that they traveled to NBC that day in a private van.  *See* Smith Tr. at 35.  The other testimony demonstrates only that when Smith was hired to work a bodyguard job for Epps, he could not leave that job whenever he felt like it, *see id.* at 98-99, and was expected to continue his work "until the job is done," *see* Epps Tr. at 78; *see also id.* at 76-77.  As to whether Smith received "any instruction" from either Epps or Street Execs, Plaintiff cites pages 21-23 and 43-44 of Smith's deposition testimony to demonstrate these "issues."  Smith's testimony, however, is irrelevant as it was in reference to his *first* job with Epps.  Furthermore, Smith clearly testified that he never "received any type of bodyguard training" from Epps or anyone who worked for Epps, or "any type of instruction or direction about what [his] duties . . . and responsibilities were as a bodyguard" for Epps, between his first job and the Alleged Incident.  *See id.* at 23-24.  Finally, Smith's testimony on pages 43-44—in which he explained that his "duties" as Epps' bodyguard on October 27, 2017 entailed "keep[ing] him safe and mak[ing] sure he makes it to the taping on time and safely"—does not mention the method and means by which he was supposed to do so.  *See id.* at 43-44.

particular night and where on its premises the guards should be posted at any given time, and also required that the guards not carry weapons and never fight back with patrons or people on the street and thereby could be said to have given them instructions relating to the manner in which they performed their work"); *McCann*, 2010 WL 1637080, at *6 (holding that the security guard was an independent contractor, not an employee, where the evidence demonstrated that the security guard "does not have a set schedule," "works on an as needed basis," and "receives a 1099, not a W2, for the work he does").

Moreover, the cases cited by Plaintiff in his opposition are inapposite. In fact, many of them do not involve alleged torts or claims based on vicarious liability at all. *Century Surety Co. v. Franchise Contractors, LLC*, No. 14 Civ. 277 (NRB), 2016 WL 1030134 (S.D.N.Y. Mar. 10, 2016) and *In re Pozarycki*, 738 N.Y.S.2d 748 (App. Div. 2002), for instance, are both insurance coverage disputes that did not involve any alleged torts or vicarious liability claims. In *Century Surety Co.*, the court analyzed the interpretation of an "independent contractor exclusion" in an insurance contract. *See* 2016 WL 1030134, at *6. In *Pozarycki*, the court reviewed an appeal from the Unemployment Insurance Appeal Board, and ultimately concluded that there was "no basis to disturb the Board's decision" as it "could rationally conclude that CMS exercised sufficient direction and control to establish that claimant was an employee" based on, among other things, the fact that the claimant "received his assignments from CMS by mail, along with [an] evaluation form," which the claimant was required to complete and return, and which, upon receipt, "a CMS employee would review . . . and request corrections [to] if necessary." *See* 738 N.Y.S.2d at 749-50. *Anyan v. New York Life Insurance Co.*, 192 F. Supp. 2d 228 (S.D.N.Y. 2002), a discrimination case brought under anti-discrimination statutes such as Title VII, also did not involve tortious acts or vicarious liability. There, the court concluded that the plaintiff "was not an employee of New

York Life *for purposes of the employment statutes*, as a matter of law." *See* 192 F. Supp. 2d at 239 (emphasis added). *Nachman v. Koureichi*, 85 N.Y.S.3d 185 (App. Div. 2018), a case that did involve claims against an employer on the basis of vicarious liability, is factually distinguishable. In *Nachman*, the evidence demonstrated that the individual in question "worked for Hudson six days per week, from 10:00 a.m. to 7:00 p.m., that he was required to call a supervisor employed by Hudson if he could not report to work," and "that he wore a t-shirt provided by Hudson" and "had a two-way radio provided by Hudson" in connection with his employment. *See* 85 N.Y.S.3d at 187. No such facts are established here. Notably, Plaintiff has failed to cite any cases involving similar factual circumstances to those here, or to distinguish any of the cases that Epps cited involving similar such circumstances.

Finally, the Court concludes that Smith was not an "employee" of Street Execs, Epps' business management agency, either. As a preliminary matter, Street Execs is not a defendant in this action.[12] Plaintiff nonetheless asserts that "[t]here are issues as to who the actual hiring party is, [] Epps or Street Execs," *see* Pl. 56.1 ¶¶ 4-5, 9, 13, 22, and that "the issue of whether or not [] Smith is an independent contractor cannot be decided as a matter of law" because it is "unclear who the hiring party" was when Smith was first retained over a decade ago. *See* Pl. Opp'n at 7; *see also id.* at 10 (arguing that "it is not possible to conduct an independent contractor analysis without confirming who hired [] Smith in the first place"). While the initial hiring party may be relevant in some cases, it is not dispositive. In any event, the relevant question here is whether

---

[12] At the December 18, 2019 status conference in this case—which was held after the close of fact discovery and during which Epps informed the Court of his intent to move for summary judgment—Plaintiff indicated for the first time that he sought to file a motion to amend the Complaint to add Street Execs as a defendant. *See* Dkt. 41. For the reasons discussed in Judge Parker's Report, and adopted without objection by this Court, Plaintiff failed to demonstrate why amendment should be permitted at this late stage under Rules 15(a), 16(b), and/or 21, including by "fail[ing] to explain why he could not have learned of the existence of Street Execs sooner." *See* Report at 7; *see also id.* ("It is plain to this Court that Plaintiff has not exercised diligence in this case. Plaintiff has had plenty of time to learn facts about potential parties to join, but took no steps to identify new parties in a diligent fashion.").

Smith was an employee of Epps *at the time of the Alleged Incident*—i.e., on October 27, 2017—not when he was first hired.  *See, e.g.*, *McLaughlan*, 52 N.Y.S.3d at 93 (analyzing whether security guard was an employee or an independent contractor "when the incident occurred").  Whether Smith was considered an "employee" when he was first hired, approximately eight years prior to the Alleged Incident, is thus beside the point.

In short, whether Epps or Street Execs—or some other entity—technically "hired" Smith, it is clear based on the record that Smith was initially—and has since continued to be—acting as an independent contractor when working for Epps.[13]  *See, e.g.*, Smith Decl. ¶ 3 ("Prior to and on the date of the Alleged Incident, . . . Epps' business management agency ha[d] retained me to provide security services for [] Epps as an independent contractor."); Epps Decl. ¶¶ 3, 5 (explaining that Smith had been "occasionally retained" as "an independent contractor to provide [Epps] with security services for specific occasions" for "approximately eight years prior to October 27, 2017," and was "working as an independent contractor" on October 27, 2017); Epps Tr. at 23-24 (testifying that Street Execs, his "management team," hired Smith for the first time about a decade ago); *id.* at 29 (testifying that Smith has been "hired by Street Execs" each time since his first job); *see also* Karol Russell Decl. ¶¶ 3-4 (asserting that Epps has "occasionally retained" Smith "as an independent contractor" to provide "security services for specific occasions"); *id.* ¶¶ 5-6 (asserting that Street Execs "does not issue payment or tax forms" to Smith, nor "provide health insurance" to Smith).  Plaintiff's citation to page 19 of Smith's deposition testimony, *see* Pl. 56.1 ¶¶ 4-5, 9, 13, 22, does not change this conclusion.  At that juncture in the deposition, Smith merely explained

---

[13] Street Execs' business manager, Karol Russell, submitted a declaration in connection with Epps' motion, asserting not only that Street Execs "does not employ" and "has never employed" Smith, but also that Smith "does not act as an independent contractor for Street Execs, and has never done so."  *See* Dkt. 65 ("Karol Russell Decl.") ¶ 4.  These statements are not inconsistent with those in Epps' declaration, in which he asserts that he has occasionally retained Smith as an independent contractor, but has never employed him.  *See* Epps Decl. ¶ 3.

that approximately eleven years ago, he first got a job as a bodyguard for Epps—his cousin—by asking him for a job. *See* Smith Tr. at 19:2-8. This is not inconsistent, however, with Epps' testimony that Street Execs subsequently hired Smith to provide Epps protective services, *see* Epps Tr. at 23-25, as Street Execs had the "direct authority" to "hire and fire people" on Epps' behalf, *see id.* at 44, and that Epps was not personally involved in that process, *see id.* at 26-27. Even more to the point, this testimony does not demonstrate that Smith was Epps' "employee" on October 27, 2017.

The Court thus concludes, based on the record before it, that Smith worked for Epps as an independent contractor. Accordingly, Epps cannot be held liable for Smith's alleged tortious acts based on a theory of respondeat superior or vicarious liability.

### B. Within the Scope of Employment

Even if Smith could be considered Epps' employee, the evidence demonstrates that Smith's alleged assault on Plaintiff was not "within the scope of employment," and Epps is entitled to summary judgment for this reason as well. For an employer to be held vicariously liable for its employee's tortious acts, the employee's acts must have been "committed in furtherance of the employer's business" and "within the scope of employment." *See Rivera*, 34 N.Y.3d at 389 (quoting *Doe v. Guthrie Clinic, Ltd.*, 22 N.Y.3d 480, 484 (2014)); *see also Sachs*, 2012 WL 3822220, at *17 ("[A]s a general rule, employers are held vicariously liable for their employees' torts only to the extent that the underlying acts were within the scope of employment.") (quoting *Adams v. N.Y.C. Transit Auth.*, 88 N.Y.2d 116, 119 (1996)); *Tasso v. Platinum Guild Int'l*, No. 94 Civ. 8288 (LAP), 1997 WL 16066, at *6 (S.D.N.Y. Jan. 16, 1997) ("[A]n employer is not subject to liability based upon 'torts committed for personal motives unrelated to the furtherance of the employer's business.'") (quoting *Island Associated Coop. v. Hartmann*, 500 N.Y.S.2d 315, 316 (App. Div. 1986)). "The general rule is that an employee acts within the scope of his employment

when he is acting in furtherance of the duties owed to the employer and where the employer is or could be exercising some degree of control, directly or indirectly over the employee's activities." *Luna v. Spadafora*, 7 N.Y.S.3d 413, 417 (App. Div. 2015) (citation omitted).

To determine whether an employee was acting "within the scope of employment" for purposes of vicarious liability, the New York Court of Appeals has set forth five factors: "[1] the connection between the time, place and occasion for the act; [2] the history of the relationship between employer and employee as spelled out in actual practice; [3] whether the act is one commonly done by such an employee; [4] the extent of departure from normal methods of performance; and [5] whether the specific act was one that the employer could reasonably have anticipated (i.e., whether it was foreseeable)." *Rivera*, 34 N.Y.3d at 389-90 (quoting *Rivello v. Waldron*, 47 N.Y.2d 297, 303 (1979)) (internal quotation marks omitted); *see also Chau v. Donovan*, 357 F. Supp. 3d 276, 291 & n.6 (S.D.N.Y. 2019); *Sachs*, 2012 WL 3822220, at *17-18. "New York courts 'generally place greater emphasis on the fifth factor.'" *Chau*, 357 F. Supp. 3d at 291 n.6 (quoting *Adorno v. Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 516-17 (S.D.N.Y. 2004)). As to this factor, "while it is not necessary that the precise type of injury caused by the employee's act be foreseeable, it is necessary that the conduct is, in a general sense, reasonably foreseeable." *Dykes v. McRoberts Protective Agency, Inc.*, 680 N.Y.S.2d 513, 514 (App. Div. 1998). Additionally, as relevant here, "New York Courts have long held that assaulting acts of employees are outside the scope of their employment." *See Phillips*, 2017 WL 2782036, at *6 (collecting cases). In particular, numerous courts have concluded that a security guard's alleged assault is outside the scope of his employment. *See, e.g.*, *Dykes*, 680 N.Y.S.2d at 514; *Kirkman v. Astoria Gen. Hosp.*, 611 N.Y.S.2d 615, 616 (App. Div. 1994); *McCann*, 2010 WL 1637080, at *7-8. Whether an employee was acting within the scope of employment is generally a question of fact,

but may be resolved at summary judgment where "the evidence submitted by the parties . . . demonstrates as a matter of law that [the tortfeasor] was not acting within the scope of his employment." *See Dykes*, 680 N.Y.S.2d at 514.

Smith was hired on the date of the Alleged Incident to provide protective services to Epps, as he had been many times before. Smith testified that his responsibilities as a bodyguard for Epps were generally "to make sure the perimeter is clear and [] Epps is safe," *see* Smith Tr. at 23, and that on October 27, 2017 in particular, his duties were "to keep [Epps] safe and make sure he makes it to the taping on time and safely, that's about it," *see id.* at 44. Although Plaintiff contends that Smith's alleged assault was within the scope of his employment because his duties as a bodyguard for Epps involved "trying to designate a perimeter and protect [] Epps from [Plaintiff], whom he saw as a threat," *see* Pl. Opp'n at 15, there is nothing in the record to suggest that using physical or violent contact was part of Smith's job responsibilities. To the contrary, it is undisputed that Smith had "an exemplary record of avoiding physical altercations when providing security services and de-escalating stressful situations," Epps 56.1 ¶ 17, and that during all of the times that Smith served as a bodyguard prior to the Alleged Incident, he "had never used physical force on someone while providing security services to anyone, including [] Epps," *id.* ¶ 16. It is further undisputed that Epps "was not aware of any prior violent acts" by Smith, or of Smith "having any propensity for violence." *Id.* ¶ 18. Plaintiff has not set forth evidence to demonstrate that using violence or physical contact was within the scope of Smith's employment. In fact, as Smith's job was to keep Epps safe, any violent acts on Smith's part would constitute a clear "departure from [his] normal security personnel duties." *See Kirkman*, 611 N.Y.S.2d at 616.

Because Plaintiff has not raised any genuine issues as to Smith's status as an independent contractor, and because even if Smith were considered Epps' employee, his tortious acts were

22

outside the scope of his employment, Epps is entitled to summary judgment on the First and Second Causes of Action.

## II.    Plaintiff's Negligent Hiring and Retention and Punitive Damages Claims

Plaintiff's Third Cause of Action—asserted only against Epps—is for negligent hiring and retention.  Plaintiff also asserts a Fourth Cause of Action for punitive damages against both Defendants.  In his motion for summary judgment, Epps contends that he is entitled to summary judgment as to both of these claims for several reasons, including that Plaintiff has failed to allege —let alone set forth evidence to establish—many of the elements of the negligent hiring and retention claim, *see* Epps Mot. at 13-20, and because New York law does not recognize a separate cause of action for punitive damages, *see id.* at 20-21.  In his opposition, Plaintiff does not refute any of Epps' arguments as to these claims.  Nor does he even mention these causes of action.  As a result, Epps argues in his reply brief that Plaintiff has conceded that his Third and Fourth Causes of Action should be dismissed.  *See* Epps Reply at 2.  The Court agrees.

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Xu v. City of New York*, No. 18-CV-1222 (RA), 2020 WL 2088301, at *4 (S.D.N.Y. Apr. 30, 2020) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)). Accordingly, the Court concludes that "an inference may be fairly drawn from [Plaintiff's] papers" that "abandonment was intended" as to his Third and Fourth Causes of Action against Epps.  *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014); *see also Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) ("Where, as here, a counseled non-moving party submits a partial response arguing that summary judgment should be denied as to some claims while not mentioning others, that response may be deemed an abandonment of the unmentioned claims.") (internal

quotation marks and citation omitted).  Epps is therefore entitled to summary judgment on the Third and Fourth Causes of Action as well.

## CONCLUSION

For the foregoing reasons, Defendant Epps' motion for summary judgment is granted.  The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 53 and enter judgment in favor of Epps.  No later than June 24, 2020, Plaintiff and Defendant Smith shall file a joint letter updating the Court on the status of the remainder of the case, including when they will be prepared for trial, if they consent to a bench trial, and whether they believe a referral to the magistrate judge for a settlement conference or to a mediator for mediation would be productive at this time.

SO ORDERED.

Dated:     June 10, 2020
           New York, New York

Ronnie Abrams
United States District Judge