**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/13/2022

WRITER'S DIRECT DIAL NO.
212-849-7655

WRITER'S EMAIL ADDRESS
lindamoon@quinnemanuel.com

February 15, 2022

**Via ECF**

Honorable Katharine Parker
United States Magistrate Judge
United States District Court
500 Pearl St.
New York, NY 10007

> A discovery conference is scheduled for **July 11, 2022 at 3:00 p.m.** At the scheduled time, counsel shall call Judge Parker's conference line**. Please dial (866) 434-5269; Code: 4858267.**
>
> SO ORDERED:
>
> *[signature]*
> HON. KATHARINE H. PARKER
> UNITED STATES MAGISTRATE JUDGE     6/13/2022

Re:     *Capak v. Epps, et al.*, No. 18-CV-4325 (RA) (KHP)

Dear Judge Parker:

We are counsel to Defendant Rory Smith in the above-referenced action, and we respectfully submit this letter in response to the Court's Order (ECF No. 129) to address certain pre-trial discovery issues with Your Honor.

As newly assigned counsel, we respectfully request that the Court permit Mr. Smith to (1) obtain documents that both Defendants in this case previously requested from Plaintiff but never received, and (2) depose any expert witnesses whose testimony Plaintiff intends to rely on at trial.

While we are mindful that the Court previously deemed discovery completed, we believe "good cause" exists in this case for discovery to be reopened for limited purposes. *See Fischer v. Verizon New York, Inc.*, No. 18-CV-11628 (RA), 2021 WL 5827639, at *4 (S.D.N.Y. Dec. 8, 2021) (quoting *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir. 1991)); Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Here, Plaintiff is well-aware of the requests specified in this letter and is under a continuing obligation to supplement his responses. *See* Fed. R. Civ. P. 26(e) ("A party who has made a disclosure under Rule 26(a) . . . must supplement . . . its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect,

and if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]").

Specifically, during a deposition held on November 12, 2019, Plaintiff referenced at least three items responsive to Defendants' discovery requests. Defendants subsequently made explicit requests for those items as specified below, but Plaintiff never produced them.

- The records from Plaintiff's visit to a New Jersey emergency room following an automobile accident in 2015 and/or 2016 and records related to subsequent treatments Plaintiff received. *See* Excerpt of Deposition of R.J. Capak ("Capak Depo.") (attached hereto as Exhibit A) at 203:6–205:24; *id.* at 219:19–22; *see also* ECF No. 108 (Defendant's letter requesting extension of time to complete expert discovery); ECF No. 114 (joint status letter informing the Court that Defendant was unable to obtain the medical records from the third-party provider).

- A video taken by a third-party and referenced in Plaintiff's deposition, *see* Capak Depo. at 85:14–16 ("As a matter of fact, I got somebody's video, and the guy yelled out, that guy knocked him out, man."), and requested by Defendant Epp's counsel, *see id.* at 179:17–180:18.

- Any statements Harry Velez provided to anyone relating to the October 17, 2017 incident, such as those made to the NYPD and the district attorney's office. *See* Capak Depo. at 195:14–196:24.

We contacted Plaintiff's counsel by email in an effort to obtain his agreement to the production of the foregoing items and to discuss the availability of any potential expert witness Plaintiff intends to call as a witness. As of the filing of this letter, we have received no response.

For the foregoing reasons, Mr. Smith respectfully requests that the Court reopen discovery for the limited purposes requested herein.

Very truly yours,

 */s/ Linda Moon*

Linda Moon
Tai H. Park


cc:     Harris Marks
        Sanford Alan Rubenstein
        Rory Smith

# EXHIBIT A

Page 82

1  am already at my spot. I am already videotaping,
2  and then I see Rory just comes, he just comes
3  charging towards me at that point, while 2 Chainz is
4  walking with the dog. So Rory is out in front of
5  everybody.
6      Q.   So according to you, they are in a
7  single-file line?
8      A.   I didn't say single file. I don't know
9  what they are walking in. I am just saying I
10 believe they were behind 2 Chainz. I may be wrong.
11 You've got to look at the video. Why don't we look
12 at the video?
13     Q.   Because I want to get your recollection
14 right now.
15     A.   Okay.
16     Q.   So --
17     A.   But I don't remember where everybody was
18 except for 2 Chainz and Rory. That is all I am
19 concentrating on. I could care less about everybody
20 else.
21     Q.   I understand, but you indicated an
22 entourage of five or six people comes walking in
23 through the special doors, and they are not single
24 file?
25     A.   I don't know what order they are in.

Page 83

1      Q.   Okay.
2      A.   And I didn't say they are single file.
3  I don't know what they are doing. I'm
4  concentrating, there might have been a couple or two
5  or three that shot up ahead of him. I don't know.
6  I am just looking for 2 Chainz. I don't care about
7  anybody else.
8      Q.   Several people shot ahead?
9      A.   I'm guessing. I don't know. I don't
10 know.
11     Q.   Okay. So they are not in a single file.
12 You are sure of that?
13     A.   Yeah. No. I don't think they would be
14 in a single file. It is not a narrow corridor. It
15 is a wide lobby.
16     Q.   So you have got five or six people
17 walking your way?
18     A.   They're walking -- not walking. If I am
19 over here, they are over there. That is what it
20 looks like. I am here, and they are walking along
21 there, and then they go right and left. I'm not in
22 front of them in any way. I am off at an angle.
23     Q.   Okay. When this group of people is
24 walking, I guess towards the elevator, and they are
25 walking towards the elevator?

Page 84

1      A.   I don't know. I'm not looking at them,
2  but I know that they got out of the car, and I
3  assume they are going up with him. I'm not
4  recollecting the other people at this point. I'm
5  just, you know, but you can see in the first part of
6  my video everybody coming out, everybody doing what
7  they are doing.
8      Q.   Do you remember what 2 Chainz was
9  wearing?
10     A.   Red.
11     Q.   Anything else?
12     A.   Jumpsuit. It looked like a sweat jump,
13 you know, type of suit.
14     Q.   Jewelry, sunglasses?
15     A.   I don't remember all of that. I just
16 remember it was kind of like a red outfit. It
17 looked like a, you know, sweats-type outfit.
18     Q.   Anything else?
19     A.   I wasn't really looking. Especially in
20 the lobby. You know, I wasn't really looking.
21     Q.   Okay. So they are walking in, and what
22 happens next?
23     A.   They are walking in, and Rory has
24 2 Chainz' crutch, and he just comes walking towards
25 me, and as he's walking towards me, he pulls the

Page 85

1  crutch up, so it is like now parallel to the ground,
2  and he is coming right for my head, and I am like,
3  okay, he can't be doing this, you know what I mean?
4  So I am like ignoring it, ignoring it, and then the
5  next thing I know he is trying to put his hand on
6  the camcorder, and I am backing up the whole time as
7  he's coming towards me, and then the next thing I
8  know I am out.
9      Q.   And that is what you believe occurred?
10     A.   I can see it in the video. I saw the
11 NBC video. When I woke up and everybody was like
12 are you okay, and they are helping me to my feet. I
13 was like what happened? Did he hit me, and they
14 were like yeah. They said, you were out, dude. As
15 a matter of fact, I got somebody's video, and the
16 guy yelled out, that guy knocked him out, man. I
17 was, oh, my God.
18     Q.   So tell me what the person with the
19 crutch was doing?
20     A.   He was menacing me, coming towards me.
21 He was coming towards me like he was jousting me or
22 something.
23     Q.   Do you know what the purpose of what
24 this person was trying to do?
25     A.   He was trying to hurt me.

Page 178

1   alleged herein in any manner whatsoever."
2       A.   Okay.
3       Q.   Do you know what that means?
4       A.   That means that I didn't cause the
5   situation, I guess.
6       Q.   Okay.  Do you believe that to be
7   accurate?
8       A.   Sure.
9       Q.   And why?
10      A.   Why would I?  I wasn't doing anything
11  that was threatening.
12      Q.   You mentioned earlier that you had
13  swatted at the crutch.
14      A.   That is a menacing act.  So you are
15  trying to say that because I tried to keep myself
16  from being injured, that somehow I am complicit in
17  this?  Is that what you are saying?
18      Q.   My question is to you.
19      A.   Yeah.  What is the question?
20      Q.   The question is do you view you swatting
21  away the crutch as any evidence of contributing to
22  the incident?
23      A.   No, not at all.
24      Q.   Do you view your actions of being in the
25  lobby of 30 Rock at all contributing to the

Page 179

1   incident?
2       A.   No.
3       Q.   Okay.  Do you view anything that you did
4   on the day of the incident contributed to the
5   accident?
6       A.   No.
7       Q.   Do you know how many videos exist of the
8   incident?
9       A.   I can only assume my video and NBC's
10  video.  Now, if somebody else took any, I am not
11  privy to that except for that one video that I
12  mentioned, but I believe that was after the fact.  I
13  am already sitting in the background I think with my
14  head bandaged, so it is not of the incident.  It is
15  after the incident of some guy saying that guy
16  knocked him out.
17      Q.   Okay, and this third video that you are
18  mentioning, who took that video?
19      A.   I don't know.  I think it was a fan that
20  posted it to social media, and I was able to
21  download it real quick.
22      Q.   Have you seen that video?
23      A.   I have seen that video.
24      Q.   Okay.  When did you last see that video?
25      A.   Oh, I don't know.  It is just sitting in

Page 180

1   my files.
2       Q.   Do you know if that video has been
3   produced by your lawyers in this case?
4       A.   I don't think so.
5            MR. YOUNG:  Okay.  Well, I will just
6       make that request on the record that it be
7       produced.
8            MR. SCHWARTZ:  Did you give it to us?
9            THE WITNESS:  No.
10           MR. SCHWARTZ:  Can we have it, please?
11           THE WITNESS:  If you ask nicely.
12           MR. SCHWARTZ:  If you would like to make
13      any separate written demands, we would be
14      happy to respond to those separate written
15      demands upon receipt of same.
16           MR. YOUNG:  Certainly.  We will follow
17      up in writing.
18           MR. SCHWARTZ:  Thank you.
19      Q.   Do you have any recollection -- let me
20  start over.  I believe you testified you recall
21  swatting away the crutch and not remembering what
22  happened next.  Is that right?
23      A.   Right.
24      Q.   Okay.  So you don't know what you did or
25  said to Mr. Smith at that point?  Is that correct?

Page 181

1       A.   There was nothing that I could have said
2   that warranted him taking me and knocking me out.
3       Q.   Okay.  Is there anything you could have
4   done?
5       A.   There is nothing I have done except swat
6   away the crutch, as far as I know, and again, there
7   is nothing I could be doing except defending myself,
8   something along those lines there.
9       Q.   Okay.  When you say defending yourself,
10  defending yourself from what exactly?
11      A.   From him being in my face and hurting
12  me.
13      Q.   Okay, but the thing that was in your
14  face you said was the soft end of the crutch?
15      A.   The crutch.  It just happened to have a
16  rubber tip on it, but are you saying that was okay
17  to assault me with, because it had a rubber tip on
18  it?
19      Q.   I am asking if you viewed that as a
20  threat.  That's the question.
21      A.   The whole crutch is a threat.
22      Q.   The whole crutch is a threat because
23  it's in your face?
24      A.   It's coming at my face, and I don't know
25  if he is going to just jab it at me, cock it and

Page 194

1  we looked at in the last exhibit.  This is where you
2  verify that you have read the foregoing, know the
3  contents thereof, and you believe the same is true,
4  to your own knowledge, except as to the matters
5  therein stated to be alleged upon information and
6  belief, and as to those matters, I believe it to be
7  true.
8            Do you see that?
9       A.   I do, but what is this here where it
10 says the name signed must be printed underneath?  Is
11 it my name that is supposed to be there?
12      Q.   Well, I can't answer any questions from
13 you today, but I'm happy for you to talk to your own
14 lawyer.
15      A.   Whose name is supposed to be on this
16 document?  I want to make sure it's valid.
17           MR. SCHWARTZ:  In theory, your name
18      would be typed underneath the signature.
19           THE WITNESS:  So it is a faulty
20      document, in other words.  Okay.
21      Q.   So let's turn to page 1 which carries
22 over to page 2.  It is labeled interrogatory number
23 2 on the first page.  Do you see that?
24      A.   I do.
25      Q.   Okay.  It says "Identify each and every

Page 195

1  person who possesses knowledge of any facts relevant
2  to the subject matter."  Then it continues.  I want
3  to focus on your response, which is on the following
4  page.
5            You reference Harry Velez, who is
6  employed as an autographer as someone who possesses
7  knowledge relevant.
8       A.   He's a photographer.  He was the guy
9  that was there that took the pictures of me and
10 helped me up and stuff.
11      Q.   Okay.  Autographer, is that a
12 profession.  It is unfamiliar to me.  What is it?
13      A.   They get celebrity autographs.
14      Q.   Okay.  What did Harry Velez witness, to
15 your knowledge?
16      A.   He was the one that was closest to me.
17      Q.   Closest to you at what point in time?
18      A.   When the incident happened.  He said he
19 was like I think he said he was just off to the side
20 and behind me, I believe he said.
21      Q.   What was he wearing that day?
22      A.   I don't know.  I don't even know what I
23 was wearing.
24      Q.   Is he visible in the video that you took
25 or that you're aware of?

Page 196

1       A.   I don't think he is in my video.  I
2  believe he is behind me.
3       Q.   Was he talking to you?  Did you have any
4  communications with him?
5       A.   No.  I didn't even really, you know,
6  acknowledge him being there.
7       Q.   Do you know what Harry Velez did
8  subsequent to the incident?
9       A.   What do you mean?
10      Q.   In terms of did he help you?
11      A.   He helped me get up, and then he was
12 like, are you okay, and I said, do me a favor, take
13 some pictures, so he did.
14      Q.   Okay.  What did he take pictures of, to
15 your knowledge?
16      A.   Me sitting in the chair, my head
17 bleeding, people aiding me.  Stuff like that.
18      Q.   Okay.  Do you know if Mr. Velez has
19 provided a statement to the police or to anyone?
20      A.   I believe he gave a witness statement.
21           MR. YOUNG:  For the record, we will
22      follow up in writing for a copy of any
23      statements that Mr. Velez has provided to
24      anyone relating to this incident.
25           MR. SCHWARTZ:  We look forward to,

Page 197

1       following the conclusion of this oral
2       examination, our receipt of a separate
3       written demand, and upon our receipt of same
4       we will be happy to respond.
5       Q.   Okay.  Other than Mr. Velez, you did
6  reference other people that you thought were there
7  at the scene?
8       A.   Other people were there, but he's the
9  one who basically saw what happened.
10      Q.   Okay, and to your knowledge, none of the
11 other people you reference today saw what happened.
12 Is that right?
13      A.   Saw the actual striking of me, no.  I
14 believe Marie and Sam I believe were over to the
15 left, and I believe Harry was back behind me
16 somewhere and off to the side, because I think he
17 was outside too and came running in or something
18 like that.  I'm not sure.
19           I just noted that he said he saw it, and
20 he was the first one there to help me up, him and
21 then Sam came running over, and Marie came over.
22      Q.   Okay, and did Mr. Velez tell you what he
23 witnessed?
24      A.   I believe when I got up, I said did he
25 hit me, and he said, hell, yeah, something to that

Page 202

1  were in a car accident?
2      A.  I think I was in a car accident, I think
3  it was like two years before.  I was sitting at a
4  red light, and I got rear-ended.  Thank God, there
5  was a cop car right there.
6      Q.  Where were you?
7      A.  Where was I?  We were just coming back
8  from I guess Seaside Heights in New Jersey.
9      Q.  Okay.  Were you in New York or New
10 Jersey?
11     A.  New Jersey.
12     Q.  Okay.  Were you on the driver's side?
13     A.  Yeah, I was driving.
14     Q.  Okay, and somebody rear-ended you?
15     A.  He was on his phone.
16     Q.  Do you know how fast he was going?
17     A.  No.
18     Q.  Roughly approximate speed?
19     A.  Oh, I couldn't.  How do I know?  I
20 didn't see him hit me.  I just, you know, heard the
21 screech, and by the time I even looked up, the
22 impact.  I mean, you know.
23     Q.  Was the car totaled?
24     A.  Yeah, they totaled it.  It was a 2008
25 Accord, and he kind of pushed in the left side of

Page 203

1  the trunk, and because I guess they bent part of the
2  frame, they decided it was cheaper to total it than
3  to try to fix it.
4      Q.  And what injuries did you sustain in
5  that car accident?
6      A.  Well, I didn't sustain any injuries at
7  first I didn't think, but when my passenger wanted
8  to be checked out, she was hurt, and so I am sitting
9  in the hospital there, and I just remember one of
10 the nurses coming over and say you don't look so
11 good and said, you know, let's get him checked out,
12 and I didn't want to, but she said, look, you need
13 to be checked out.  So we got checked out.  They did
14 a CAT scan on me.  They said everything looked good.
15 If anything, it is probably a case, you know, of
16 maybe whiplash or something.
17     Q.  You were at an ER?  Where did you go?
18     A.  An ambulance came to take my passenger,
19 so I sat in the passenger seat and just hopped the
20 ride.  I couldn't take the car.
21     Q.  Do you know what hospital you went to?
22     A.  No, I don't.
23     Q.  Was it in Seaside Heights?
24     A.  No, it was a town.  I think it was --
25 give me a minute.  I'm not like I was.  It is a

Page 204

1  weird name, the town.  I don't remember.
2      Q.  Okay.  So you testified that you didn't
3  think you were hurt at first, but subsequently you
4  thought you were.
5      A.  Well, they thought I looked a little
6  pale, I guess, or something, you know or something
7  because they said, look, you need to be checked out.
8  You don't look so good.  I was like okay.  I think I
9  was just, you know, shocked, because it was my
10 father's car, and he died, and my mom gave it to me,
11 and now it is totaled.
12     Q.  What injuries were you diagnosed with?
13     A.  They just said it looks like, if
14 anything, it could be a case of whiplash.
15     Q.  Okay.  And that was what was diagnosed
16 at the ER?
17     A.  Yeah, that is what the doctor said after
18 looking at the x-ray.  He said, you know, I don't
19 see anything, so if anything, it is probably a mild
20 case of whiplash.  He goes you might feel sore in a
21 couple of days, but you know, just put hot
22 compresses on it and you should be okay.
23     Q.  Did you have any subsequent treatment
24 plans that you had to follow?
25     A.  No.  Well, I felt a little stiff after

Page 205

1  that, and so, you know, I went to the VA, and I told
2  them about it, and they put me in physical therapy.
3      Q.  How long did physical therapy last?
4      A.  I think it was like maybe ten visits, so
5  I am going to say ten weeks.  Maybe, I don't know if
6  I went twice a week for the first week or two and
7  then maybe once a week after that.  I really don't
8  remember.
9      Q.  Who was the passenger in the vehicle?
10     A.  Marie Arnold, my girlfriend.
11     Q.  That is the same Marie we talked about
12 earlier?
13     A.  Yes.
14     Q.  Other than the physical therapy, did you
15 take any other medications or have any other
16 treatment plan?
17     A.  I don't even like taking aspirin, but
18 now I have gotta.
19     Q.  So is it correct that, after the ten
20 weeks or so of physical therapy, you didn't continue
21 any kind of treatment?
22     A.  No.  Everything seemed okay.  I had some
23 things checked out.  I think I went to a
24 chiropractor also for a little bit, which really was
25 that I like.  It just feels like it does something.

Page 218
1  in an MRI?
2       A.   I have no idea.
3       Q.   Let's turn to page 11.  I want to focus
4  on the second paragraph here.  This is a report
5  prepared by at the top Spine & Orthopaedic
6  Rehabilitation.  The date is December 6, 2017.  Do
7  you see that?
8       A.   Yes.
9       Q.   Just focusing on that second paragraph
10 where it begins "He has a history," it says "He has
11 a history of a motor vehicle accident in June 2015.
12 He believes the left shoulder was the most painful.
13 He vaguely remembers he may have had some right
14 shoulder and neck pain initially also."
15           Do you see that?
16      A.   I do see that.
17      Q.   Okay.  Do you recall having pain?
18      A.   No, again, you know, when you are
19 talking to the doctor, you know, what I am saying
20 and evidently, you know, what they write down could
21 be two different things, so I don't know, you know.
22 It is interesting.  I mean they say something.  It
23 is almost a little different from what they said
24 initially the first time I was there, so I don't
25 know if they are reading their own notes or what

Page 219
1  they are doing over there.  I have no idea.
2       Q.   Okay.  So is it wrong that you suffered
3  injuries to your left and right shoulder and neck?
4       A.   I guess the only thing that I remember
5  was my neck from the car accident.  It's the only
6  thing that I really remember.
7       Q.   Just to be clear, other than the
8  physical therapy, you didn't engage in any other
9  treatment subsequent to the car accident?
10      A.   Subsequent to the car accident, you mean
11 after the car accident?
12      Q.   After the car accident, yes.
13      A.   As I mentioned earlier, yes, I went in
14 and I got treatment at the VA with the physical
15 therapy.
16      Q.   And other than the physical therapy, you
17 did no other treatment?
18      A.   No, not that I remember.  No.
19           MR. YOUNG:  Just for the record, and we
20      will follow up in writing, we will want all
21      records related to the car accident and the
22      subsequent treatment as well.
23           THE WITNESS:  I don't know where they
24      are.  I mean you have got to go to the
25      hospital.

Page 220
1            MR. SCHWARTZ:  I don't know if that is
2       necessary or appropriate, but if you would be
3       so happy as to follow up in a separate
4       written demand, we would be happy to respond
5       to that separate written demand upon our
6       receipt of same.
7       Q.   I just want to turn now back to the
8  prior exhibit which is going to be 24.  Do you have
9  that in front of you still?  The interrogatory
10 responses.
11           I just want to focus now on the laundry
12 list of injuries that I guess are on page 10 of that
13 document.
14      A.   Again, I don't understand medical
15 terminology here, so.
16      Q.   No, that's fine.  To the best of your
17 ability, I just want to understand how these
18 injuries relate to the incident and how exactly you
19 understand you suffered the injury as a result of
20 the incident.
21      A.   Well, I mean I was knocked off my feet.
22 I landed on I would assume my back, shoulder blades
23 and my head.  The head obviously hit the floor, and
24 it must have hit it in such a way that I mean it
25 didn't crack open, but as you stated earlier, it was

Page 221
1  an abrasion.  I guess, you know, the skin is broken.
2  You are bleeding.
3            So I don't see how that happened.  I
4  must have slid on the floor or something, because,
5  you know, just hitting it, I can't see how that
6  would have caused an abrasion.  I can see if it
7  split open and I needed, you know, something else,
8  so I don't know, but after that is when all this
9  started.  That's when my neck, my shoulder blades,
10 lower back, my head especially.  My head and my neck
11 are the big ones.  When I am sleeping at night, now
12 it is my shoulders, because I am tossing and I am
13 turning, and this has been nonstop.
14      Q.   Okay, and The list of injuries that are
15 on the page in response to interrogatory 5, are
16 these all injuries that a doctor or medical
17 professional has stated was the result of the
18 October 2017 incident or are these injuries that you
19 understand were caused by the incident?
20      A.   These are what I believe to be caused by
21 Rory.
22      Q.   And when you say Rory, you mean the
23 October 2017 incident?
24      A.   Yes, 10/27/17.
25      Q.   Yes, and just to be clear, October 2017